UNITED STATES of America Plaintiff,

v.

William Ricky LOVELL, Defendant.

No. 1:03CR00090.

United States District Court,
W.D. Virginia,
Abingdon Division.

May 17, 2004.

R. Lucas Hobbs, Assistant United States Attorney, Abingdon, VA, for United States of America.

John E. Jessee, Jessee, Read & Ely, P.C., Abingdon, VA, for Defendant William Ricky Lovell.

## OPINION AND ORDER

JONES, Chief Judge.

Before me is the defendant's Motion to Suppress certain incriminating statements made by him to law enforcement officers on two separate occasions without advisement of his *Miranda* rights. I find that the first statement was made during an interrogation within the meaning of *Miranda*, and thus the statement must be suppressed. However, as to the second occasion, I find that the defendant was not in custody, and his statement is not subject to suppression.

I

The defendant, William Ricky Lovell, is charged in a two-count indictment with being a felon in possession of a firearm and with possession of a stolen firearm.[1]

---

**1.** Lovell has indicated that he intends to plead guilty to at least one of the charges currently

Lovell has moved to suppress statements made to law enforcement officers during two separate meetings.[2] The motion was referred to the Honorable Pamela Meade Sargent, United States Magistrate Judge, who held an evidentiary hearing and issued a report and recommendation that the motion should be denied with regard to all the statements at issue. The defendant filed timely objections to the report and recommendation. These objections have been briefed and argued, and additional evidence has been introduced by stipulation of the parties. The motion and the corresponding objections are now before me.

The charges facing Lovell stem from the theft of six firearms from the residence of James Lineberry in or around September 2002. Investigators Venton Smith and Freddie Bobbitt of the Carroll County Sheriff's Department investigated the crime and recovered two of the stolen shotguns from an individual named Lee Frost and a stolen rifle from another individual named Robert Hill. Hill told the investigators that he had purchased the rifle from a Bobby Jones, who had in turn purchased it from defendant Lovell.

Prior to the conclusion of the theft investigation, Lovell was charged by the Commonwealth of Virginia on presumably unrelated matters and was being detained at the New River Valley Regional Jail. On February 7, 2003, Lovell was brought to the Carroll County Courthouse and was placed in a holding cell to await proceedings related to the state charges. At some point after his arrival, Investigators Smith and Bobbitt removed Lovell from the cell and escorted him, with legs shackled and one arm shackled to the waist, into an interview room. The investigators were not equipped with any pens, paper, or recording devices that may normally facilitate questioning or interrogation. In the room, Bobbitt and Smith showed Lovell the rifle and told him it had been recovered from Hill. Although Bobbitt maintained during the hearing before the magistrate judge that they "didn't ask [Lovell] to say anything [and] didn't ask any questions of him whatsoever" (Jan.2004 Tr. 7), Smith related that they told him they had some breaking and entering crimes about which they wanted to talk with him. Nevertheless, upon seeing and presumably recognizing the rifle, Lovell said, "You got me. That's the gun." (*Id.*) The investigators did not pursue the confession with any further questioning. However, as they were walking Lovell back to the holding cell, he expressed a desire to arrange a deal with the Commonwealth's attorney.

The government concedes that the investigators did not advise Lovell of his constitutional right against self-incrimination pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), at the time of this encounter. Bobbitt and Smith testified that they were familiar with Lovell and had read him *Miranda* rights on previous occasions, the most recent instance being in the mid-nineties.

It is also undisputed that the defendant was not accompanied by counsel during this meeting. The investigators knew that Dwight Compton had been appointed as Lovell's counsel to represent him on the pending state criminal charges and assumed that he could represent the defen-

---

facing him. The record does not yet contain a copy of the proposed plea agreement between Lovell and the government.

**2.** If Lovell pleads guilty, the resolution of this motion may impact his base offense level and sentencing range, pursuant to U.S. Sentencing Guidelines Manual § 2K2.1(b) (2003), which increases a defendant's base offense level if three or more firearms are involved in the offense.

dant on the charges then being investigated as well, saying "Compton was holding himself out as ... Lovell's attorney at that time." (*Id.* at 10–11.) Although Investigator Smith testified that he had spoken to Compton as the case developed and had informed him that Lovell would be charged with more crimes, it is unclear whether Smith and Bobbitt told Compton of their plans to confront Lovell with the gun. While Smith testified that he told Compton that he "would like to maybe get together with him" but did not seek permission to show him the gun, Bobbitt recounted that he explained to Compton his plans to confront Lovell with the stolen rifle. (*Id.* at 21.) Bobbitt stated, "Mr. Compton did not tell me that I could not do that, nor did he say that he wanted to be present." (*Id.*) Bobbitt also testified that he spoke with Compton on February 7, after the encounter with Lovell.

At the hearing before the magistrate judge, the investigators were questioned extensively about their purpose in confronting a suspect with a weapon allegedly involved in the crime but not expecting him to make any incriminating statements. Bobbitt explained that the defendant is a "show-me kind of person"[3] and that the investigators' intent in showing Lovell the gun was to obtain his cooperation on a series of breaking and entering crimes by letting "him know that, yes, we do have a crime. We've investigated and recovered some property. We have witnesses that are willing to state this. And, yes, we are going to charge you on this." (*Id.* at 24–25.) Smith maintained that the investigators' primary goal was to recover the property stolen in the series of breaking and

entering crimes about which they thought Lovell had information. Smith said Lovell was told that he "didn't need ... to confess to this one, or [that he] didn't want him to make any statements until he talked to his lawyer." (*Id.* at 64.) Smith further testified that he and Bobbitt were "trying to give [Lovell] reason to get with his attorney and try to negotiate and work this thing and clear out more cases ....
[T]he Lineberry [breaking and entering] was not supposed to be interviewed." (*Id.* at 76, 77.)

Bobbitt and Smith again met with Lovell on May 2, 2003, in an interview room at the Carroll County Sheriff's Office, this time in the presence of Lovell's assumed attorney Compton. Bobbitt and Smith had requested Compton to arrange both the meeting and Lovell's transportation to the Sheriff's Office.[4] Lovell had both legs shackled and one arm shackled to the waste in this meeting as well. According to Bobbitt, the purpose of the meeting was to relay to Lovell the Commonwealth attorney's response to his request for a deal and "to come to a conclusion on this case and several other matters ...." (*Id.* at 30.)

The evidence is unclear as to whether the defendant was properly advised of his *Miranda* rights in conjunction with this meeting. Bobbitt related that Lovell was advised by his lawyer that he had the right to remain silent, that his lawyer was there to advise him, that he did not have to speak with the investigators, and that he was free to leave the room at any time. Smith however testified, "My guess from his attorney, they discussed it before they come in there." (*Id.* at 69.) Under either

---

**3.** Later in his testimony, Investigator Bobbitt defined a "show-me kind of guy" as one to whom "you have ... to prove that you have something on him in order for him to cooperate." (Jan.2004 Tr. 58–59.)

**4.** Lovell was still in jail on this date. The pending state charge was nol prossed on April 25, 2003, although Bobbitt claimed he did not know that at the time of the May 2 interview. Lovell remained in jail due to a probation violation.

scenario, the testimony notably indicates that Lovell was not advised that any statements he made could be used against him, and a written waiver of rights was not obtained. Furthermore, while Investigator Bobbitt testified that it is his personal practice on most occasions to document his notes to confirm that *Miranda* warnings were administered, the notes from this meeting do not explicitly indicate that Lovell was advised of these rights immediately preceding this interview.

Through the course of the meeting, Bobbitt and Smith questioned Lovell about the series of breaking and entering crimes that were being investigated, and Lovell admitted to breaking into the Lineberry residence and stealing six firearms. At some point during the meeting, Lovell's attorney was called into court and excused himself, leaving the defendant alone with Bobbitt and Smith. Upon departing, Compton advised Lovell that he could stop talking to the investigators at any time and that, if he did not want to continue, he could have someone call for Compton to return. The investigators also informed Lovell of his rights, explaining that he did not have to talk with them, that he had a right to talk to and seek advice from his lawyer, and that he was free to leave at any time. Lovell indicated that he understood, and the investigators proceeded with questioning him about the Lineberry theft, outside the presence of counsel.

Lovell made an oral statement admitting to breaking into the Lineberry home, taking guns, and trading them with Lee Frost and Bobby Jones in exchange for methamphetamine. He refused to sign a written statement. The investigators asked additional questions about another theft at the residence of Sammy Patton, but Lovell said he could not help on this and refused to talk further. Bobbitt testified that Lovell admitted to breaking into the Lineberry home and made some unspecified in-criminating statements about the evidence prior to his counsel's departure from the meeting.

The defendant has moved to suppress the incriminating statements he made during the February and May meetings, claiming that they were obtained in violation of his Fifth Amendment right against self-incrimination, as interpreted in *Miranda*. Lovell maintains that both meetings constituted custodial interrogations, thereby triggering *Miranda*. The evidence is uncontested that no rights were read to him at the February meeting. At the May meeting, he was at the least not advised that any statements he made could be used against him. Lovell also asserts that he did not waive his right against self-incrimination at either meeting.

In response, the government maintains that the statements in issue were obtained constitutionally and are admissible since the defendant's *Miranda* rights were never triggered. It argues that the February 7 meeting was not an "interrogation" because the investigators' statements were declaratory in nature and because Lovell was told not to say anything in response to seeing the rifle. Likewise, it asserts that the May 2 meeting was not "custodial" because Lovell voluntarily appeared and made statements at the meeting. The government notes that Lovell's shackled state is a routine procedure for prisoners and does not reflect whether he was in custody for purposes of the present inquiry. Finally, the government submits that the circumstances of the case, particularly Lovell's previous exposure to the criminal system, permit an inference that the defendant waived his *Miranda* rights during the meetings in question.

The facts going to the heart of the motion are uncontested, and the issues involve the legal significance of those facts. I have reviewed the submitted briefs, the

transcript of the suppression hearing, the magistrate judge's findings and recommendation, and the oral arguments held before me. The motion is now ripe for decision.

## II

Pursuant to the Federal Magistrates Act, a motion to suppress evidence in a criminal case may be referred to a magistrate judge to conduct an evidentiary hearing and to submit proposed findings of fact and a recommendation for disposition to the district court judge. *See* 28 U.S.C.A. § 636(b)(1)(B) (West 1993 & Supp.2003). Upon issuance of the magistrate judge's report and recommendation, the parties may file objections thereto. I am obligated to make a de novo determination of those specified aspects of the report to which objections are made, and I may, after reviewing the entire record, "accept, reject, or modify, in whole or in part, the findings or recommendations" of the magistrate judge. *See* 28 U.S.C.A. § 636(b)(1) (West 1993 & Supp.2003); *see also United States v. Schronce,* 727 F.2d 91, 93–94 (4th Cir.1984).

■ Prompted by concerns that "the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely," *Miranda* and its progeny dictate that an individual subject to custodial interrogation must be apprised by law enforcement officers prior to the start of the interrogation that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda,* 384 U.S. at 444, 467, 86 S.Ct. 1602. Although a verbatim recital of these warnings is not required for a custodial interrogation to be *Miranda* compliant, statements obtained without advising a suspect of these substantive rights are in violation of a defendant's Fifth Amendment right against self-incrimination and are inadmissible in the government's case-in-chief. *See Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *California v. Prysock,* 453 U.S. 355, 359–60, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981); *Michigan v. Mosley,* 423 U.S. 96, 100, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Where *Miranda* warnings are given, a defendant may waive the affiliated rights if the waiver is knowing, intelligent, and voluntary. *See United States v. Cristobal,* 293 F.3d 134, 139–42 (4th Cir.2002).

■ *Miranda* does not bear upon all interactions between individuals and law enforcement officials and is triggered only by a "custodial interrogation." Whether an interaction is custodial for these purposes is to be determined by the totality of the circumstances. Custody exists in any circumstance where there is a formal arrest or where a reasonable person would perceive restraints on her "freedom of movement of the degree associated with a formal arrest." *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (internal citations omitted). Because this standard is of limited utility in a jail or prison setting where an individual may constantly endure restraints comparable to formal arrest, for an inmate, these restraints must be such that create a change in the inmate's surroundings which lead to additional constraints on her freedom of movement. *See United States v. Conley,* 779 F.2d 970, 973 (4th Cir.1985). In an interrogation situation, the degree of constraints, and therefore the presence or absence of custody, are reflected by the language used to summon the individual, the physical surroundings of the interrogation, the primary purpose for which the questioning

was initiated, the nature of the interaction, the extent to which the inmate is confronted with evidence of guilt, the standard degree of restraints normally present in the prison facility, the relationship between the law enforcement officers and the individual inmate, and the use of any additional pressure to detain the inmate in the situation. *See id.* at 973–74; *Cervantes v. Walker,* 589 F.2d 424, 428 (9th Cir.1978).

An interrogation for *Miranda* purposes may be direct questioning or its functional equivalent. "[A]ny words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect" are the functional equivalent of questioning. *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The impact of these words or actions is to be assessed from the suspect's viewpoint rather than based on the officer's intent. *See id.*

### III

As to the February 2003 encounter between Bobbitt, Smith, and Lovell, the evidence is undisputed that *Miranda* warnings were not administered. The government does not assert that the encounter was not custodial but maintains that it did not constitute an interrogation. Investigators Bobbitt and Smith testified that they asked no direct questions of Lovell during the meeting. Instead, their conduct consisted of physically displaying the rifle to him and making declaratory statements, including issuing instructions to Lovell to not say anything. Given the facts of the case, I find that such conduct was the functional equivalent of questioning because the investigators, knowing from their investigations that the rifle had been traced to Lovell and that Lovell was a "show-me" type of person, should have

known that the suspect was reasonably likely to make incriminating statements when confronted with a crucial piece of evidence.

Significantly, the impact of the investigators' words and conduct is to be assessed from Lovell's viewpoint. Upon seeing the rifle, Lovell likely understood both that the investigators had located one of the stolen weapons and that they had secured the cooperation of at least one if not two individuals who could incriminate him. This perception conforms to the intended impact of the rifle. By their own testimony, the investigators regarded Lovell as a "show-me kind of person" and hoped that he would understand the nature of the evidence against him and the likelihood that he would be charged. Given Lovell's susceptibility to actually seeing the evidence against him, the central role of the rifle in the crime for which Lovell was being investigated, and the impact of having the weapon of which Lovell had allegedly rid himself reappear, the investigators should have known that their conduct was persuasive to Lovell and was reasonably likely to result in incriminating statements. *See Innis,* 446 U.S. at 302 n. 8, 100 S.Ct. 1682 ("Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect."). This encounter falls within the concerns expressed in *Miranda* of the coercive tactics utilized by law enforcement against those being questioned as suspects.

The government argues that since Bobbitt and Smith told Lovell not to say anything upon seeing the rifle, it is unreasonable to hold that they should have known that he would disregard their instructions

and make an incriminating statement anyway. This contention is feeble because the investigators' very intent in showing Lovell the weapon was to elicit information from him. Indeed, their words, conveying in effect "don't say anything," contradicted their conduct, which essentially implied "tell us what you know." In light of Bobbitt and Smith's awareness of the defendant's particular susceptibility to being confronted with evidence, an investigator in their role reasonably should have known that Lovell was more likely to disregard their oral instructions in favor of their implicit message.

In addition, it appears from their testimony that Bobbitt and Smith's real intent in the February meeting was not that Lovell should say nothing, but that Lovell should say nothing about the Lineberry theft. Viewing the interactions from the suspect's position, it is beyond comprehension that the investigators hoped their instructions to Lovell would be enough to prevent him from making incriminating statements about the Lineberry theft but would not stifle his willingness to provide information with regard to the other thefts. Insofar as the key difference is that the investigators wanted Lovell to provide them information at a later time, rather than in that meeting, their instructions, when paired with the visual impact of the rifle, were not sufficient to permit them to reasonably believe that the encounter would not immediately elicit any incriminating statements from him.

It is worthwhile to distinguish the instant case from *United States v. Haynes*, 26 Fed.Appx. 123, 2001 WL 1459702 (4th Cir.2001) (unpublished). The relevant facts of that matter were that Willis Mark Haynes and Dustin John Higgs were suspected by FBI agents of a triple murder, when Haynes was arrested on a federal drug charge. Approximately two and a half hours after he was arrested, officers entered the interview room in which he was being held and, after some small talk, "advised Haynes that they wanted to bring some items to his attention, but specifically advised [him] that they were not asking him any questions and did not want him to comment." *Id.* at 129. They proceeded to show him a telephone record showing that a phone call was made from Higgs' phone to a friend of Haynes near the time of the murders, a transcript from a plea hearing related to a separate shooting (the Cherry Lane shooting) in which Higgs claimed Haynes had used a .38 caliber firearm, and a sham ballistics report indicating that the bullets recovered from the Cherry Lane shooting matched those extracted from the three murdered victims. In response to seeing this evidence, Haynes admitted that he had called a friend from Higgs' apartment near the time of the murders. When charged with the murders, Haynes moved to suppress this incriminating statement because it was made without the benefit of *Miranda* warnings. The Fourth Circuit held that the statement was not made during an interrogation because the officers had specifically instructed Haynes not to say anything and were merely showing him the progress they had made in the investigation. *Miranda* was therefore not triggered, and the statement was held admissible.

As a preliminary matter, I note that the *Haynes* opinion is an unpublished disposition and thus has limited precedential value. *See* 4th Cir. R. 36(c). In addition, the facts of this case do not parallel those of *Haynes* and warrant a different result. First, in *Haynes*, the display of the evidence was not a psychological technique designed to encourage cooperation by exploiting any particular weaknesses the suspect may have had. In notable contrast, Investigators Bobbitt and Smith showed Lovell the rifle precisely to capitalize on his susceptibility to being confronted with

evidence. Pursuant to *Innis*, knowing of this susceptibility, Bobbitt and Smith should have known with greater certainty that it was likely to be a successful technique and lead to incriminating statements. *See Innis*, 446 U.S. at 302 n. 8, 100 S.Ct. 1682.

Likewise, the specific chronology of events in the encounters with Haynes and Lovell is dissimilar to an important degree. In *Haynes*, the officers warned the suspect before actually showing him the items that they were going to show him some things and that they did not want him to comment. In Lovell's case, Bobbitt related the sequence of events within the meeting, saying that he "[s]howed [Lovell] the [rifle]. Laid it down on the table and said: I've got you. This is the crime you've committed. I'm going to prove it. I don't want you to say anything to me. I don't want to hear anything." (Jan.2004 Tr. 8.) Although the difference may initially appear to be subtle, it is essential from the suspect's perspective. Whereas Haynes was verbally prepared for the visual display, which came after a session of idle talk unrelated to the crime, the rifle was exhibited to Lovell at the start of the encounter. The abrupt nature in which the rifle was displayed combined with the investigators' strategic awareness of Lovell's "show-me" personality makes the encounter more than a mere report to the suspect on the status of the investigation and functionally an interrogation.

Lastly, the evidence displayed in *Haynes* was not as central to the crime and therefore not as provocative as was that displayed to Lovell. The telephone record, the transcript, and the falsified ballistics report were all tangential, indirect evidence. In contrast, the rifle shown to Lovell was direct evidence of a vital component of the potential charges for which Lovell was being investigated. Given the nature of the evidence displayed,

Investigators Bobbitt and Smith should have known that it was likely to elicit an immediate incriminating response from Lovell, even with any verbal warnings to the contrary. As a result of these pivotal distinctions, *Haynes* is not analogous to the present case and is not persuasive.

The government also places extensive reliance on *United States v. Payne*, 954 F.2d 199 (4th Cir.1992). I am guided by the Fourth Circuit in that case that there is no per se rule that an interrogation has taken place for *Miranda* purposes anytime law enforcement officers present to a suspect the nature of the evidence against her. Instead, "[t]he inquiry mandated by *Innis* into the perceptions of the suspect is necessarily contextual[,] . . . and whether descriptions of incriminating evidence constitute the functional equivalent of interrogation will depend on circumstances that are too numerous to catalogue." *Id.* at 203 (internal citations omitted). Thus, *Payne* encourages a case-by-case analysis to determine whether presentation of evidence to a suspect constitutes interrogation. The court analyzed the facts of that case and concluded that, where an agent who was transporting a suspect in an automobile received a phone call informing her that a gun had been found at the suspect's house and made a casual statement to the suspect of the finding, the interaction between the agent and the suspect was not such that the agent should have known that her statement was reasonably likely to elicit an incriminating response. Clearly, the facts of the present case are not comparable. The plan to show Lovell the rifle was deliberately designed to exploit his weakness, and the investigators should have known that it was reasonably likely to elicit an immediate incriminating response from him.

Although the transcript is somewhat ambiguous, it appears that the government

argued during the hearing before the magistrate judge that the court should infer from the totality of the circumstances that the defendant waived his *Miranda* rights during the February meeting. To this contention, I note that a suspect does not have the authority to dispose of a law enforcement official's obligation to administer *Miranda* warnings prior to a custodial interrogation. As the Supreme Court unequivocally stated, these warnings are "an absolute prerequisite to interrogation. No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead." *Miranda*, 384 U.S. at 471–72, 86 S.Ct. 1602. Even in instances where suspects have waived their right to consult with an attorney prior to an interrogation, such rights have only been waived after the suspects have been given the proper *Miranda* readings. *See Poyner v. Murray*, 964 F.2d 1404, 1410 (4th Cir.1992). Where, as in the present case, *Miranda* warnings were not administered to Lovell altogether, the question of a waiver of those rights is meaningless.

For these reasons, I find that the February 2003 encounter between Bobbitt, Smith, and Lovell was a custodial interrogation for *Miranda* purposes. Because the requisite *Miranda* warnings were not administered, any statements made by Lovell during that encounter and related to the present case are properly suppressed.

### IV

■ During the May 2003 encounter, Lovell was, at best, only partially advised of his *Miranda* rights. Neither the investigators nor his attorney explicitly informed him that his statements could be used against him. The government's position that *Miranda* warnings were not obligatory on this occasion because the interrogation was not custodial is well-taken. As the Fourth Circuit has confirmed, the mere fact that the defendant was an inmate at the time of this meeting and that he consequently arrived in shackles is not sufficient to render him in custody for *Miranda* purposes. Instead, looking at the totality of the circumstances, the evidence indicates that Lovell's presence at the meeting was arranged by his attorney and that Lovell participated voluntarily, in furtherance of his expressed desire to enter into an arrangement with the Commonwealth's attorney whereby any sentence he received would be limited to two years. In addition, the nature of the interaction appears to have been such that Lovell was to tell the investigators whatever he wanted. There was no force, compulsion, or psychological persuasion used by Bobbitt and Smith to force the defendant to cooperate. The two officers also told Lovell at least once that he was free to leave if he wanted. Indeed, when Lovell expressed an unwillingness to answer further questions, the investigators ended the interview. Lovell was free to end the conversation whenever he wished and be transported back to the New River Valley Regional Jail. Thus, the May meeting was not a custodial interrogation, and *Miranda* warnings were not constitutionally required. Any deficiency in the warnings that Lovell was given is therefore immaterial.

Lovell invokes *Mathis v. United States*, 391 U.S. 1, 4–5, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), for the proposition that suspects incarcerated in state jail on unrelated charges are entitled to *Miranda* warnings if interrogated. Although the gist of this proposition is true, the Fourth Circuit has noted the limits of the doctrine: "We ... decline to read *Mathis* as compelling the use of *Miranda* warnings prior to all prisoner interrogations and hold that a prison inmate is not automatically always in 'custody' within the meaning of *Miranda*." *Conley*, 779 F.2d at 972–73; *see also United States v. Cooper*, 800 F.2d 412,

414 (4th Cir.1986). Thus, the apparent similarity of the facts of the instant case to those of *Mathis* rather than to those of *Conley* is irrelevant. *Conley* encourages a case-by-case analysis of the circumstances of the interrogation to determine whether it was custodial and curtails *Mathis* as affirming that even inmates maintain a constitutional right against self-incrimination and may not be denied *Miranda* warnings as a group. *Mathis* is therefore not as broad as Lovell advances and is not dispositive with regard to the facts at hand.

For these reasons, I find that the May 2003 meeting between Bobbitt, Smith, Lovell, and Compton was not a custodial interrogation for *Miranda* purposes. Therefore, the investigators were not required to administer *Miranda* warnings on that occasion, and any statements made by Lovell during that encounter are admissible. Because *Miranda* was inapplicable, I need not consider any questions of whether Lovell waived his *Miranda*-related rights.

V

For the foregoing reasons, I accept in part and reject in part the magistrate judge's findings and recommendation, and I find that statements made by Lovell in the February 2003 meeting are inadmissible while those made in the May 2003 meeting are admissible. Accordingly, it is **ORDERED** that the defendant's Motion to Suppress [Doc. No. 19] is granted in part and denied in part.